```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                       11-20104-CR-KING/BANDSTRA


THE UNITED STATES OF AMERICA, )
                              )
           PLAINTIFF,         )
                              )
      VS.                     )
                              )
DAN MELINDO, JR.,             )        THIS VOLUME:
                              )        PAGES 1 - 18
           DEFENDANT.         )
_____)
                   (TRANSCRIPT BY DIGITAL RECORDING)

          TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD BEFORE
THE HONORABLE EDWIN G. TORRES, IN MIAMI, MIAMI-DADE COUNTY,
FLORIDA, ON JANUARY 28, 2011, IN THE ABOVE-STYLED MATTER.


APPEARANCES:

FOR THE GOVERNMENT:      ELISA CASTROLUGO, A.U.S.A.
                         99 NE 4TH STREET
                         MIAMI, FL 33132 - 305 961-9033

FOR THE DEFENDANT:       VINCENT FARINA, A.F.P.D.
                         150 W. FLAGLER STREET, SUITE 1500
                         MIAMI, FL 33130 - 305 536-6900




                          CARL SCHANZLEH

                       OFFICIAL COURT REPORTER

                          U. S. COURTHOUSE

                     299 E. BROWARD BLVD., 202B

                   FORT LAUDERDALE, FLORIDA 33301

                            954 769-5488
```

1

2                     TABLE OF CONTENTS

3  WITNESSES:                      DIRECT   CROSS REDIRECT RECROSS

4  RELDYS TORRES ............................ 10

5                     INDEX TO EXHIBITS

6  EXHIBITS                    MARKED FOR        RECEIVED
                               IDENTIFICATION    IN EVIDENCE
7
   DESCRIPTION                PAGE     LINE     PAGE     LINE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2    (MIAMI, MIAMI-DADE COUNTY, FLORIDA;  JANUARY 28, 2011, IN OPEN
 3    COURT.)
 4              THE CLERK:  CALLING CASE UNITED STATES VERSUS DAN
 5    MELINDO, JR., CASE NUMBER 11-2099, JUDGE TORRES.
 6              MS. CASTROLUGO:  GOOD MORNING, YOUR HONOR.  ELISA
 7    CASTROLUGO, ASSISTANT UNITED STATES ATTORNEY, FOR THE UNITED
 8    STATES.
 9              MR. FARINA:  GOOD MORNING, YOUR HONOR.  VINCENT
10    FARINA, ASSISTANT FEDERAL PUBLIC DEFENDER, ON BEHALF OF
11    MR. MELINDO WHO IS PRESENT.
12              MS. CASTROLUGO:  YOUR HONOR, WE ARE PRESENTLY HERE FOR
13    A PRETRIAL DETENTION HEARING AS TO MR. MELINDO.
14              THE COURT:  OKAY.  DO WE HAVE AN AGREEMENT OR DO WE
15    PROCEED?
16              MR. FARINA:  NO.  WOULD HE PROCEED, JUDGE.  THANK YOU.
17              THE COURT:  OKAY.  GO AHEAD, MISS CASTROLUGO.
18              MS. CASTROLUGO:  YES, YOUR HONOR.
19         THE GOVERNMENT IS REQUESTING THE DEFENDANT'S PRETRIAL
20    DETENTION ON THE BASIS OF RISK OF FLIGHT.  I WOULD LIKE TO
21    PROCEED BY PROFFER FIRST IN STARTING WITH THE NATURE OF THE
22    CRIME AND THE WEIGHT OF THE EVIDENCE AGAINST THIS DEFENDANT.
23              AS YOUR HONOR IS PROBABLY ALREADY AWARE, MR. DAN
24    MELINDO WHO IS A RESIDENT OF CALIFORNIA HAS BEEN PRESENT IN THE
25    MIAMI AREA SINCE DECEMBER OF 2010 WHEN HE BEGAN HIS CRIMINAL
```

1 CONDUCT THAT'S CHARGED IN THE CRIMINAL COMPLAINT IN THIS CASE
2 OF PURCHASING UNITED STATES MONEY ORDERS AT MIAMI AREA POST
3 OFFICES, THEN HAVING THOSE MONEY ORDERS ALTERED, OR CAUSING
4 THEM TO BE ALTERED, BEFORE CASHING THEM AT CHECK CASHING STORES
5 HERE IN MIAMI FOR A DIFFERENT AMOUNT.
6      MR. MELINDO'S CONDUCTS IN THE LAST TWO MONTHS SINCE HE
7 HAS BEEN IN THE MIAMI AREA HAS RESULTED IN LOSSES OF OVER
8 $20,000.
9      SPECIFICALLY AS CHARGED IN THE CRIMINAL COMPLAINT IN
10 THIS CASE ON DECEMBER 21ST, 2010, DAN MELINDO PURCHASED THREE
11 MONEY ORDERS AT A POST OFFICE IN MIAMI BEACH IN THE AMOUNT OF A
12 HUNDRED DOLLARS EACH. THEN THE FOLLOWING DAY HE WENT TO A
13 CHECK CASHING STORE ON BISCAYNE BOULEVARD AND CASHED THOSE
14 MONEY ORDERS THAT HAD BEEN ALTERED IN THE AMOUNT OF $900 AND HE
15 WAS CAUGHT ON SURVEILLANCE VIDEO AND THAT'S HOW HE HAS BEEN
16 IDENTIFIED, YOUR HONOR.
17      HE WAS DETAINED A COUPLE OF DAYS AGO ON JANUARY 26,
18 2011, AT THE SAME MIAMI BEACH POST OFFICE WHERE HE HAD
19 PREVIOUSLY PURCHASED MONEY ORDERS THAT HAD BEEN ALTERED. HE
20 WAS ABOUT TO PURCHASE MORE MONEY ORDERS TO CONTINUE COMMITTING
21 THE CRIMINAL CONDUCT. HE FLED FROM POLICE AFTER THE MIAMI
22 BEACH POLICE DEPARTMENT RESPONDED TO THE SCENE AND PROVIDED LAW
23 ENFORCEMENT WITH AN ALIAS AT THE TIME OF HIS ARREST.
24      HE WAS INTERVIEWED BY POSTAL INSPECTORS AT THE SCENE
25 AND HE ADMITTED --

```
 1             THE COURT:  WITH WHAT DO YOU MEAN HE FLED -- I'M
 2  SORRY.  BACK UP.
 3             MS. CASTROLUGO:  YES, YOUR HONOR.
 4             WHEN THE MIAMI BEACH POLICE DEPARTMENT WAS CALLED TO
 5  THE POST OFFICE BECAUSE HE WAS RECOGNIZED BY THE EMPLOYEES HE
 6  FLED FROM THEM, AND THERE WAS ACTUALLY A PURSUIT THAT RESULTED,
 7  A CHASE THAT ENSUED AFTER THAT.  HE WAS ULTIMATELY ACTUALLY
 8  DETAINED OR ARRESTED.
 9             HE WAS -- FOLLOWING HIS ARREST HE WAS INTERVIEWED BY
10  POSTAL INSPECTORS.  HE ADMITTED IN POST-MIRANDA STATEMENTS HIS
11  INVOLVEMENT IN THE SCHEME.  HE ADMITTED THAT HE HAD BEEN
12  CASHING ALTERED CHECKS.  HE CLAIMED THAT HE HAD AN ASSOCIATE IN
13  CALIFORNIA WHO WAS ALTERING THEM, BUT HE WAS THE ONE PURCHASING
14  THE MONEY ORDERS, SENDING TO HIM, AND THEN CASHING THEM AFTER
15  THEY HAD BEEN ALTERED FOR A DIFFERENT AMOUNT.
16             HE ALLOWED POSTAL INSPECTORS TO SEARCH HIS HOTEL ROOM
17  WHERE HE HAS BEEN STAYING, AND IN THAT HOTEL ROOM POSTAL
18  INSPECTORS FOUND EVIDENCE THAT IN FACT MR. MELINDO HAD BEEN
19  ATTEMPTING OR TRYING TO ALTER MONEY ORDERS HIMSELF.
20             YOUR HONOR, THIS DEFENDANT -- AS IS INDICATED IN THE
21  PRETRIAL SERVICES REPORT, THIS DEFENDANT HAS NO TIES TO THIS
22  DISTRICT.  HE TOLD THE POSTAL INSPECTORS THAT HE'S UNEMPLOYED.
23  THE PRETRIAL SERVICES REPORT INDICATES THAT -- OR AT LEAST
24  REFLECTS THAT THE DEFENDANT IS CLAIMING THAT HE IS EMPLOYED,
25  BUT BASED ON HIS OWN ADMISSION TO POSTAL INSPECTORS THERE IS AT
```

1  LEAST NO EVIDENCE THAT HE IS IN FACT EMPLOYED IN THIS DISTRICT.

2  HE IS LIVING AT A HOTEL, HE DOESN'T OWN ANY PROPERTY

3  HERE, AND HE HAS NO DRIVER'S LICENSE HERE IN FLORIDA.  HIS

4  DRIVER'S LICENSE IS IN CALIFORNIA, OR WAS ISSUED IN THE STATE

5  OF CALIFORNIA, AND ALL KNOWN ADDRESSES FOR THE DEFENDANT ARE

6  CALIFORNIA ADDRESSES.

7  ON THAT BASIS, YOUR HONOR, THE GOVERNMENT IS

8  REQUESTING THAT HE BE DETAINED BECAUSE HE PRESENTS A RISK OF

9  FLIGHT.

10  THE COURT:  MR. FARINA.

11  MR. FARINA:  JUDGE, I DON'T NEED AN AGENT.  I WOULD

12  JUST LIKE TO PRESENT SOME INFORMATION TO THE COURT.

13  THE COURT:  GO AHEAD.

14  MR. FARINA:  YOUR HONOR, HE IS WORKING AT THE CAVALIER

15  HOTEL ON MIAMI BEACH AND HE OCCUPIES ROOM 302.  AND WHAT HE DID

16  WAS IS, HE DID AGREE TO THE OFFICERS TO LET THEM SEARCH THE

17  ROOM.

18  IT IS IMPORTANT TO NOTE THAT HE IS AN AMERICAN

19  CITIZEN.  HE HAS NO PRIOR CRIMINAL HISTORY.  HE IS 30 YEARS

20  OLD.  HIS PASSPORT HAS BEEN SEIZED.  HE HAS NOT TRAVELED

21  OUTSIDE OF THE UNITED STATES IN AT LEAST FIVE YEARS.  HE HAS NO

22  SIBLINGS.  HE HAS RESIDED IN CALIFORNIA PERIODICALLY BECAUSE

23  HIS FATHER LIVES IN BETWEEN MEXICO AND CALIFORNIA.  HE HAS NO

24  CHILDREN.

25  HE ADVISED PRETRIAL SERVICES THAT HE HAD FLED FROM THE

1  OFFICERS.  I THOUGHT THAT WAS INTERESTING BECAUSE THE COMPLAINT
2  ITSELF DOES NOT LIST THAT AT ALL.  BUT HE DID ADVISE.  HE HAS
3  BEEN TOTALLY CANDID SINCE HIS ARREST AND HELPFUL.
4           I AM ASKING FOR A 10 PERCENT BOND, $20,000 10 PERCENT
5  BOND.  I HAVE IN THE COURTROOM HIS EMPLOYER.  HE IS WORKING AT
6  THE CAVALIER HOTEL, MR. RALPH I HOPE -- ABRAVAYA.  HE IS IN THE
7  COURTROOM TODAY.
8           NOW, MR. ABRAVAYA IS THE OWNER OF THE CAVALIER HOTEL.
9  HE IS WILLING TO SIGN ON A BOND TODAY FOR HIM.  I WOULD ASK FOR
10 A $20,000 10 PERCENT BOND.  THE NEBBIA CONDITION CAN BE MET
11 TODAY BECAUSE RALPH IS HERE, AND HE WILL COME UP AND TELL YOU
12 WHERE THE MONEY CAME FROM.  IT CAME FROM HIS BUSINESS, THE
13 CAVALIER HOTEL, AND THE VALUE OF THAT HOTEL ITSELF IS ABOUT 15
14 MILLION DOLLARS, AND HE HAS -- AND HE HAS EQUITY IN IT OF ABOUT
15 SIX.  SO HE IS -- (UNINTELLIGIBLE) IS AN EXCELLENT PERSON WHO
16 IS GOING TO HAVE HIM -- HE'S GOING TO BE ABLE TO WORK THERE AND
17 REMAIN LIVING THERE AT THE CAVALIER.
18          GRANTED HE DOESN'T HAVE THE TIES TO THE COMMUNITY THAT
19 WE LIKE TO SEE SOMETIME, BUT I THINK IT'S INTERESTING TO NOTE
20 THAT AFTER THIS INCIDENT HAPPENED AND HE WAS TAKEN INTO CUSTODY
21 BY THE POSTAL SERVICE THAT HE WAS THE ONE THAT ADVISED THEM
22 THAT HE HAD DONE ABOUT 30 MORE TRANSACTIONS OTHER THAN THE
23 THREE THAT ARE IN THE COMPLAINT.  SO HE WAS CANDID WITH THEM.
24          THE AMOUNT OF LOSS IN THIS CASE RIGHT NOW IS ABOUT
25 $24,000 AT THE MOST.  THAT'S THE HIGH END.  THE GUIDELINE RANGE

1  WHEN FOR THAT IS LESS THAN 33 MONTHS INCARCERATION WITH AN
2  ACCEPTANCE OF RESPONSIBILITY.
3         I DON'T THINK THIS MAN IS GOING TO FLEE.  THERE IS NO
4  INDICATION APART -- THAN HE RAN.  AND MORE OR LESS HE PANICKED
5  AT THE TIME HE WAS APPROACHED BY THE OFFICERS.  HE WAS TAKEN TO
6  JACKSON MEMORIAL HOSPITAL BY THE AGENTS AT THAT TIME.  HE LEFT
7  WITH THEM, HE DIDN'T SEEK ANY ADDITIONAL TREATMENT AND WENT
8  WITH THEM.
9         SO I THINK A BOND OF $20,000, A 10 PERCENT BOND IS
10 APPROPRIATE IN THIS CASE.  IT WILL ALSO BE SIGNED BY
11 MR. ABRAVAYA WHO IS PRESENT IN THE COURTROOM.  IN FACT --
12         THE COURT:  HOW DO YOU SPELL THAT?
13         MR. FARINA:  A-B-R-A-V-A-Y-A.
14         THE COURT:  OKAY.
15         MR. FARINA:  YOUR HONOR, DEFERRING TO THE COURT'S
16 EXPERTISE IN THESE MATTERS, BUT HE HAD A LITTLE SUPPORT THERE
17 FROM PRETRIAL SERVICES THAT ALSO RECOMMENDS A 10 PERCENT
18 BOND -- OR A PERCENTAGE BOND.
19         ONE OTHER THING, JUDGE.  I THINK THIS -- YOU KNOW,
20 LEAVE THE CONCERNS OF THE PROSECUTION, WE COULD AGREE TO
21 ELECTRONIC MONITOR FOR MY CLIENT.  I REMEMBER YESTERDAY EVEN IN
22 SPITE OF THE FACT THAT SOMEONE WAS LIVING IN A HOTEL THEY STILL
23 HAVE THE ABILITY TO USE AN ELECTRONIC MONITOR.  WE CAN LIMIT
24 HIS TRAVEL.  I THINK THAT SHOULD SUFFICE.
25         THE COURT:  MISS CASTROLUGO?

1                MS. CASTROLUGO:  YOUR HONOR, IF I MAY RESPOND.  I WANT
2   TO RESPOND TO TWO POINTS RAISED BY DEFENSE COUNSEL.
3                FIRST OF ALL, THE FACT THAT MR. MELINDO MAY HAVE COME
4   CLEAN AS TO HIS SCHEME, THAT WASN'T THE FIRST THAT LAW
5   ENFORCEMENT HAD HEARD OF IT.  HE HAD BEEN UNDER INVESTIGATION
6   FOR AT LEAST TWO MONTHS SINCE HE STARTED THE -- THE PURCHASING
7   MONEY ORDERS HERE.  HE, IN FACT, THE MIAMI BEACH POSTAL OFFICE
8   HAD BEEN ALERTED TO THAT FACT, AND THAT IS WHY THEY CALLED THE
9   POLICE WHEN HE SHOWED UP AGAIN.
10               SECONDLY, THE PERSON WHO THE DEFENDANT IS OFFERING WHO
11  APPEARS TO BE WILLING TO SIGN THE BOND, THE INVESTIGATIONS THUS
12  FAR BASED ON THE DEFENDANT'S OWN ADMISSIONS TO THE POSTAL
13  INSPECTOR HAS REVEALED THAT MR. ABRAVAYA MAY ALSO BE INVOLVED
14  IN THE SCHEME IN THAT HE WAS ALLOWING MR. MELINDO TO STAY AT
15  THE HOTEL IN EXCHANGE FOR BEING ABLE TO USE SOME OF THOSE
16  ALTERED CHECKS, OR ALTERED MONEY ORDERS, TO PURCHASE EQUIPMENT
17  AND THINGS FOR THE HOTEL -- FOR HIS BUSINESS.
18               MR. FARINA:  YOUR HONOR, THAT IS PURE SPECULATION,
19  AND -- I MEAN, THIS MAN CAME INTO THE COURTROOM TODAY READY TO
20  POST A BOND.  HE OWNS THIS COMPANY.  HE IS AN AMERICAN CITIZEN.
21  I MEAN, TO SLANDER HIM IS -- IN A CASE LIKE THIS --
22               MS. CASTROLUGO:  YOUR HONOR, IF I MAY.  THIS IS COMING
23  FROM THE DEFENDANT.
24               MR. FARINA:  YOU HAVE --
25               THE COURT:  DO YOU WANT TO CROSS-EXAMINE THE AGENT ON

```
 1  THAT POINT?
 2         MR. FARINA:  I WOULD LOVE TO.
 3         THE COURT:  OKAY.
 4         MR. FARINA:  BUT YOU KNOW WHAT, I THINK -- YEAH, LET'S
 5  CALL HIM.
 6         MS. CASTROLUGO:  I HAVE HERE THE CASE AGENT IN THIS
 7  CASE WHO IS POSTAL INSPECTOR RELDYS TORRES.
 8         THE CLERK:  RAISE YOUR RIGHT HAND.
 9         (WITNESS SWORN)
10         THE WITNESS:  I DO.
11         THE CLERK:  PLEASE HAVE A SEAT, SIR, AND SPELL YOUR
12  NAME FOR THE RECORD.
13         THE WITNESS:  REAL DOES TORRES.  THE FIRST NAME IS
14  R-E-L-D-Y-S, LAST NAME TORRES, T-O-R-R-E-S.
15         MR. FARINA:  MAY I, JUDGE?
16         THE COURT:  YES.
17         MR. FARINA:  THANK YOU.
18                    RELDYS TORRES,
19  BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:
20                  CROSS EXAMINATION
21  BY MR. FARINA:
22  Q.  AGENT, WERE YOU THE ARRESTING AGENT IN THIS CASE?
23  A.  AS FAR AS THE INSPECTION SERVICE, YES.  ON HAND ARREST AT
24  THE POINT OF -- WHERE IT TOOK PLACE, NO, I WAS NOT THERE.
25  Q.  OKAY.  BUT YOU ARRIVED ON THE SCENE SOME OTHER TIME, RIGHT?
```

1  A.  SOME TIME LATER, YES.

2  Q.  OKAY.  AND YOU CONDUCTED AN INTERVIEW OF MY CLIENT?

3  A.  YES, I DID, SIR.

4  Q.  AND DID HE TELL YOU IN THE COURSE OF THAT INTERVIEW THAT HE

5  HAD DONE OR PERFORMED ABOUT 30 MORE OF THESE POSTAL MONEY ORDER

6  TYPE THINGS?

7  A.  YES, HE DID.

8  Q.  OKAY.  NOW, PRIOR TO THAT YOU HAD BEEN INVESTIGATING THIS,

9  CORRECT?

10  A.  CORRECT.

11  Q.  ALL RIGHT.  BUT YOU HAD NOT HAD ANY PRIOR CONTACT WITH MY

12  CLIENT, HAD YOU?

13  A.  NO, I HAD NOT.

14  Q.  SO HE DIDN'T KNOW HE WAS BEING INVESTIGATED, BUT THIS WAS

15  THE COURSE OF YOUR -- YOUR WORK.

16  A.  CORRECT.

17  Q.  DID YOU CONDUCT SURVEILLANCES ON HIM, THINGS LIKE THAT?

18  A.  NO, I DID NOT.

19  Q.  ALL RIGHT.  BUT AN ALERT I TAKE IT WAS PUT OUT IN ORDER FOR

20  THE DIFFERENT POSTAL PLACES --

21  A.  OFFICES.

22  Q.  -- OFFICES THAT IF SOMEONE CAME IN THAT MAYBE FIT THIS

23  DESCRIPTION THAT THEY SHOULD BE DETAINED OR HELD?

24  A.  THE ALERT WAS MR. DAN MELINDO SINCE WE KNEW WHAT HE LOOKED

25  LIKE CAME IN AGAIN TO PURCHASE MONEY ORDERS TO CONTACT THE

1  MIAMI BEACH POLICE DEPARTMENT AS SOON AS POSSIBLE AND CONTACT
2  ME AS SOON AS POSSIBLE IN ORDER TO RESPOND TO THAT POST OFFICE.
3  Q.  NOW, PRIOR TO THAT CONTACT YOU HAD NOT IDENTIFIED
4  MR. MELINDO, CORRECT?
5  A.  I HAD IDENTIFIED HIM THROUGH VIDEO SURVEILLANCE AND CHECK
6  CASHING STORE RECORDS WHERE HE PROVIDED HIS REAL NAME.
7  Q.  ALL RIGHT.  SO YOU KNEW WHERE HE LIVED?
8  A.  NO, BECAUSE THE ADDRESS HE PROVIDED WAS THAT OF CALIFORNIA.
9  Q.  ALL RIGHT.  WHAT EVIDENCE DO YOU HAVE BESIDES THE FACT THAT
10 HE LIVED AT THAT APARTMENT AT THE CAVALIER HOTEL THAT ILLEGAL
11 ACTIVITIES WERE BEING CONDUCTED THERE AS PART OF A CONSPIRACY?
12 A.  I'M SORRY.  I DIDN'T UNDERSTAND THE QUESTION.
13 Q.  THE PROSECUTOR SAID THAT PEOPLE AT THE CAVALIER HOTEL WERE
14 ASSISTING IN THIS.  DO YOU REMEMBER THAT?
15 A.  OKAY.
16 Q.  WHAT EVIDENCE DO YOU HAVE OF THAT?
17 A.  THE EVIDENCE I HAVE OF THAT IS MR. MELINDO'S ADMISSION AND
18 SOME OF THE MONEY ORDERS WE RECOVERED FROM HIS HOTEL ROOM ALONG
19 WITH SOME CHECKS.
20 Q.  ALL RIGHT.  NOW, WHAT DID HE ADMIT TO REGARDING THE
21 CAVALIER HOTEL?
22 A.  BASICALLY HE STATED THAT HE WAS ALLOWED THE STAY THERE FOR
23 FREE, HE WAS ALLOWED TO EAT AND DRINK THERE FOR FREE IN
24 EXCHANGE FOR HIM ALTERING THE MONEY ORDERS AND BUYING, FOR
25 EXAMPLE, THE WAY HE USED IT WAS KITCHEN EQUIPMENT, LINENS, TEN

1  CENTS TO THE DOLLAR IF HE CHANGED A HUNDRED DOLLAR ORDER TO
2  NINE HUNDRED.
3  Q.  ALL RIGHT.  NOW, WHO GAVE HIM -- WHO DID HE SAY GAVE HIM
4  PERMISSION TO DO SO?
5  A.  HE SAID THAT RALPH, THE OWNER OF THE CAVALIER.
6  Q.  TO LIVE THERE?
7  A.  YES.
8  Q.  AND TO CONDUCT THIS BUSINESS IS WHAT YOU'RE SAYING.
9  A.  THAT'S WHAT HE TOLD ME, YES.
10 Q.  HE TOLD YOU THAT.
11 A.  HE TOLD ME THAT, YES.
12 Q.  ALL RIGHT.  DID YOU HAVE HIM WRITE THIS DOWN IN A
13 STATEMENT?
14 A.  HE ONLY WANTED TO WRITE DOWN THE FACT THAT HE WAS INVOLVED
15 IN THE MONEY ORDERS.  HE DIDN'T WANT TO CONTINUE WRITING DOWN
16 AND I SAID THAT'S OKAY.  THAT'S HIS RIGHT.
17 Q.  DO YOU HAVE HIS WRITTEN STATEMENT HANDY?
18 A.  YES, I DO.
19         MR. FARINA:  YOUR HONOR, MAY I?
20         THE COURT:  I'M SORRY?
21         MR. FARINA:  I WOULD LIKE TO SEE THE WRITTEN STATEMENT
22 THAT MY CLIENT GAVE IF POSSIBLE.
23         MS. CASTROLUGO:  YOUR HONOR, I DON'T THINK THAT THIS
24 IS RELEVANT TO THE DETERMINATION OF WHETHER HE POSES A RISK OF
25 FLIGHT OR NOT.

1          THE COURT:  HE IS CONCEDING HE DIDN'T WRITE THAT PART
2  OF IT DOWN.  SO I WILL ACCEPT THAT, THAT IT IS NOT IN THE
3  WRITTEN STATEMENT.
4  BY MR. FARINA:
5  Q.  WHAT OTHER INVESTIGATION HAVE YOU DONE TO CONFIRM THAT?
6  A.  OH, I HAVEN'T, SIR.
7  Q.  NOTHING AT ALL?
8  A.  NOT AT THIS TIME I HAVEN'T.
9  Q.  THE OTHER ITEMS, THE DOCUMENTATION THAT YOU FOUND IN HIS
10 ROOM -- AND, BY THE WAY, DID HE CONSENT FOR YOU TO GO INTO THE
11 ROOM AND LOOK FOR THIS MATERIAL?
12 A.  YES, HE DID, SIR.
13 Q.  AND WAS HE PRESENT WITH YOU AT THAT TIME?
14 A.  YES, HE WAS.
15 Q.  WHAT OTHER MATERIALS DID YOU FIND THAT WOULD HAVE CONFIRMED
16 THIS?
17 A.  WE FOUND A -- ALTERED MONEY ORDERS AND SOME WHAT APPEARED
18 TO BE VERSA CHECKS, COMPANY CHECKS, AND HIS COMPUTER.
19 Q.  WHEN HE WAS TAKEN INTO CUSTODY DID HE HAVE SOME MONEY ON
20 HIM?
21 A.  YES, HE DID.
22 Q.  HOW MUCH MONEY WAS THAT?
23 A.  HE HAD ABOUT EIGHTEEN NINETY-ONE -- $1,891.
24 Q.  ALL RIGHT.  NO MORE THAN THAT.
25 A.  THAT'S ALL THAT WAS GIVEN TO ME FROM CITY OF MIAMI BEACH

1  POLICE.

2  Q.  DID YOU AT ANY TIME TAKE A TAPE RECORDING OR A VIDEO

3  STATEMENT OF HIM AT ALL?

4  A.  NO, WE DID NOT.

5  Q.  NOTHING AT ALL.

6  A.  NO.

7  Q.  AND NOTHING ELSE BESIDES WHAT YOU HAVE TESTIFIED CONFIRM

8  THAT ANYONE AT THE CAVALIER HOTEL HAD ANYTHING TO DO WITH THIS?

9  A.  CORRECT.

10         MR. FARINA:  NOTHING FURTHER.

11         THANK YOU, JUDGE.

12         THE COURT:  ANY FOLLOW UP?

13         MS. CASTROLUGO:  NO, YOUR HONOR.

14         THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

15         MR. FARINA:  WELL, JUDGE, BASED ON --

16         THE COURT:  ARE YOU SURE MR. ABRAVAYA WANTS TO PUT UP

17  THE MONEY NOW?

18         MR. FARINA:  WELL, THAT'S THE POINT NOW.  I MEAN, THIS

19  ALLEGATION BEING MADE, IT MAKES IT DIFFICULT.  I WOULD STILL

20  ASK FOR A BOND TO BE SET AND JUST THAT WE WILL HAVE TO PROVIDE

21  THE MONEY IN ANOTHER FASHION.

22         THE COURT:  DOES HE HAVE ANY OTHER FAMILY HERE, ANY

23  OTHER CONNECTION HERE?

24         MR. FARINA:  NO, HE DOESN'T THAT I KNOW OF RIGHT NOW.

25  THAT WAS THE ONLY NAME THAT WAS GIVEN TO ME AT THE TIME.

1              THE COURT:  RIGHT.

2              MR. FARINA:  BUT I -- I THINK THE CONCERN IS WHERE THE

3    MONEY COMES FROM AS OPPOSED TO WHAT THE APPROPRIATE BOND IS,

4    AND IN THIS MAN'S CASE I THINK IF WE SET THE BOND IT WILL GIVE

5    ME AN OPPORTUNITY TO CHECK WITH HIS FAMILY AND SEE WHO ELSE CAN

6    POST THIS BOND FOR HIM THAT WOULD SATISFY THE COURT AND THE

7    GOVERNMENT REGARDING THE NEBBIA.

8              THE COURT:  ASSUMING THAT THERE WAS SOME OTHER --

9    OBVIOUSLY UNDER THE CIRCUMSTANCES IT MAKES IT MORE DIFFICULT

10   GIVEN THAT EVIDENCE FOR MR. ABRAVAYA.  BUT IF THERE WAS AN

11   ALTERNATIVE PERSON WHO PUT UP MONEY AND A PLACE FOR HIM TO LIVE

12   HERE, ASSUMING THAT WERE THE CASE, WOULD THAT NOT BE SUFFICIENT

13   GIVEN THE CIRCUMSTANCES OF THE CASE?

14             MS. CASTROLUGO:  WELL, YOUR HONOR, AS -- I MEAN, YOU

15   KNOW, THE DEFENDANT HAS NO CRIMINAL HISTORY.  SO WE ARE NOT --

16   YOU KNOW, WE HAVE NO INDICATION THAT THAT WILL BE -- I MEAN, WE

17   HAVE AT LEAST ON THAT RESPECT NO INDICIA HE HAS FAILED TO

18   APPEAR BEFORE, OR HE HAS FAILED TO ABIDE BY TERMS OF PROBATION,

19   OR ANYTHING LIKE THAT.

20             THE COURT:  RIGHT.

21             MS. CASTROLUGO:  BUT HE HAS NO TRIES TIES TO THIS

22   DISTRICT.  AND TO BE HONEST WITH YOU, I REALLY -- I WOULDN'T

23   FEEL COMFORTABLE WITH HIM JUST STAYING IN SOMEBODY'S HOUSE OR,

24   YOU KNOW, NOT KNOWING EXACTLY WHERE HE IS LIKELY TO JUST TAKE

25   OFF AGAIN.

1           THE COURT:  ALL RIGHT.  SO THEN WHAT I WILL DO IS,
2  IS -- I WOULD BE AMENABLE TO CONSIDERING AN OPTION ANOTHER THAN
3  DETENTION IF HE HAD ANOTHER ALTERNATIVE.
4           SO I WILL SET FOR NOW A $25,000 CORPORATE SURETY BOND
5  WITH A NEBBIA REQUIREMENT WITH AN OPPORTUNITY FOR YOU TO
6  REVISIT THAT IF HE CAN'T MAKE THAT BOND.  IF HE CAN MAKE THAT
7  BOND THEN OBVIOUSLY I WOULD NEED TO HAVE A SUPPLEMENTAL HEARING
8  TO MAKE SURE ALL OF THE CONDITIONS WERE APPROPRIATE.
9           ALL RIGHT?  AND THEN AT THAT POINT OBVIOUSLY YOU CAN
10 REQUEST FOR MODIFICATION FOR ANOTHER ALTERNATIVE, AND THAT WAY
11 WE CAN SEE WHERE THAT LEADS US.  FOR NOW OBVIOUSLY HE WILL
12 REMAIN IN OUR CUSTODY PENDING THAT.  OKAY?
13          MR. FARINA:  ALL RIGHT.  THANK YOU, YOUR HONOR.
14          MS. CASTROLUGO:  THANK YOU, YOUR HONOR.
15          THE COURT:  ALL RIGHT.
16                              - - -

C E R T I F I C A T E

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF FLORIDA

I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 17 PAGES CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN THE CITY OF MIAMI, FLORIDA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS 26TH DAY OF FEBRUARY 2011.

/S/CARL SCHANZLEH
CARL SCHANZLEH, RPR-CM
OFFICIAL FEDERAL COURT REPORTER
299 EAST BROWARD BLVD., 202B
FORT LAUDERDALE, FL  33301
TELEPHONE 954/769-5488